



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

D-1 JAMES ROBERT LIANG,

Defendant.

_____/

Case:2:16-cr-20394
Judge: Cox, Sean F.
MJ: Patti, Anthony P.
Filed: 06-01-2016 At 01:28 PM
SEALED MATTER (LG)

42 U.S.C. § 7413(c)(2)(A)
18 U.S.C. § 2

## INDICTMENT

THE GRAND JURY CHARGES:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.     The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles, including nitrogen oxides ("NOx").

2.     The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles. The EPA established standards and test procedures for light-duty motor vehicles, including emission standards for NOx.

3.    The Clean Air Act prohibited manufacturers of new motor vehicles and new motor vehicle engines from selling, offering for sale, or introducing or delivering for introduction into commerce, any new motor vehicle or new motor vehicle engine unless the vehicle or engine complied with emissions standards, including NOx emissions standards, and was issued an EPA certificate of conformity as required by the Clean Air Act and federal regulations implementing the Clean Air Act.

4.    To obtain a certificate of conformity, a manufacturer was required to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States.  The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include, among other things, the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and a description of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") to be installed on the vehicle.

5.    An AECD was defined as any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or

2

deactivating the operation of any part of the emission control system. The manufacturer was also required to include a justification for each AECD. If the EPA, in reviewing the application for a certificate of conformity, determined that the AECD reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device."

6.    The EPA would not certify motor vehicles equipped with defeat devices. Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

7.    The California Air Resources Board ("CARB") (together with the EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California. To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

8.    As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB. To obtain a certificate of

3

conformity from the EPA, manufacturers were also required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements. CARB reviewed applications from manufacturers to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

9.   In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers. Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I. For light-duty vehicles, the regulations required manufacturers to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004 and required manufacturers to fully comply with the stricter standards for model year 2007.

## Relevant Companies

10.   Volkswagen AG ("VW AG") was a motor vehicle manufacturer based in Wolfsburg, Germany.

11.   Volkswagen Group of America ("VW GOA") was a wholly owned subsidiary of VW AG based in Herndon, Virginia. VW GOA's Engineering and

Environmental Office ("EEO") was located in Auburn Hills, Michigan, in the Eastern District of Michigan.  Among other things, EEO prepared and submitted certain documents to U.S. regulators in the Eastern District of Michigan, and elsewhere, in order to obtain authorization to sell VW AG and VW GOA (collectively "VW") motor vehicles and motor vehicle engines in the United States.  VW GOA's Test Center California ("TCC") performed testing related to VW diesel vehicles, and others.

12.   Company A was an automotive engineering company based in Berlin, Germany, which specialized in software, electronics, and technology support for vehicle manufacturers.  VW AG owned fifty percent of Company A's shares and was Company A's largest customer.

### VW Diesel Vehicles Sold in the United States

13.   VW AG, through VW GOA's office in Auburn Hills, Michigan, submitted applications to the EPA and CARB for certificates for the following 2.0 liter light-duty diesel vehicles, among others:

   a.   Model Year ("MY") 2009-2015 VW Jetta;

   b.   MY 2009-2014 VW Jetta Sportwagen;

   c.   MY 2010-2015 VW Golf;

   d.   MY 2015 VW Golf Sportwagen;

5

e. MY 2010-2015 Audi A3;

f. MY 2013-2015 VW Beetle and VW Beetle Convertible; and

g. MY 2012-2015 VW Passat.

14. The above-referenced applications to the EPA were accompanied by the following signed statement by a VW representative:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause the emission into the ambient air of pollutants in the operation of its motor vehicles or motor vehicle engines which cause or contribute to an unreasonable risk to public health or welfare except as specifically permitted by the standards prescribed under section 202 of the Clean Air Act. The Volkswagen Group further states that any element of design, system, or emission control device installed or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines, for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief, cause or contribute to an unreasonable risk to public safety.
>
> . . .
>
> All vehicles have been tested in accordance with good engineering practice to ascertain that such test vehicles meet the requirement of this section for the useful life of the vehicle.

6

15.   Based on the representations VW employees made in applications for the vehicles referenced above, VW received certificates from the EPA and CARB for these vehicles, allowing VW to sell these vehicles in the United States.

16.   The first applications VW submitted for its newly designed diesel vehicles were for the MY 2009 Jetta/Jetta Sportwagen.  The EPA approved these applications on or about April 9, 2008 and on or about June 23, 2008; and CARB approved it on or about June 6, 2008 and on or about July 2, 2008.  VW continued to submit applications for each subsequent model year through model year 2016, for the diesel vehicles identified in paragraph 13 above.

17.   VW represented to the public, including its U.S. customers, U.S. regulators, dealers, investors, the media, and others, that the vehicles approved by the EPA and CARB, identified in paragraph 13 above, were "clean diesel" vehicles that emitted less pollutants, including NOx, in accordance with the new and stricter U.S. emissions standards.

18.   On or about September 3, 2015, a VW senior manager admitted to the EPA and CARB, during a meeting in El Monte, California, that VW had installed a defeat device in its "clean diesel" vehicles, which caused them to emit far more NOx than allowed under U.S. standards.

## The Defendant

19.   From in or about 1983 until in or about May 2008, defendant
JAMES ROBERT LIANG was an employee of VW AG, working in VW AG's
diesel development department in Wolfsburg, Germany.  While working in diesel
development, LIANG was part of a team of engineers that developed the diesel
engine (the "EA 189" engine) that was designed to meet the new, tougher U.S.
emissions standards for diesel vehicles.  LIANG moved to the United States in or
about May 2008 to assist in the launch of VW's new line of diesel vehicles that
had the EA 189 engine and that VW marketed to the U.S. public and its customers
as "clean diesel."  From in or about May 2008 to the present, LIANG was an
employee of VW GOA, working in California at VW GOA's TCC as the Leader of
Diesel Competence, although he still reported to VW AG employees in Germany.
In that role, LIANG assisted in certification, testing, and warranty issues for VW
diesel vehicles in the United States.

## The Purpose of the Conspiracy

20.   The purpose of the conspiracy was for LIANG and his co-conspirators
to unlawfully enrich VW and themselves by, among other things, (a) deceiving
U.S. regulators in order to obtain the necessary certificates to sell diesel vehicles in
the United States; (b) selling VW diesel vehicles to U.S. customers knowing that

8

those vehicles did not meet U.S. emissions standards; (c) deceiving U.S. customers by marketing VW diesel motor vehicles as "clean diesel" knowing that those vehicles emitted NOx at levels well above U.S. standards; and (d) concealing the defeat device from U.S. regulators, VW customers, and the U.S. public.

## The Conspiracy

21.    For almost a decade, from at least in or about November 2006 until in or about September 2015, LIANG and his co-conspirators, including current and former VW employees, and others, agreed to defraud the United States and VW customers, and violate the Clean Air Act, by misleading the United States and VW customers about whether VW diesel motor vehicles complied with U.S. emissions standards.  Almost from the beginning of VW's process to design its new "clean diesel" vehicles, LIANG and his fellow co-conspirators designed these VW diesel vehicles not to meet U.S. emissions standards, but to cheat the testing process by making it appear as if the diesel vehicles met U.S. emissions standards when, in fact, they did not.

22.    In at least in or about 2006, LIANG and his co-conspirators began to design the new EA 189 diesel engine (later known as the Generation 1 or "Gen 1"), which would be the cornerstone of a new project to sell diesel vehicles in the United States.  LIANG and his co-conspirators knew the vehicles would need to

9

comply with stricter U.S. NOx emissions standards that became effective in 2007.

Selling diesel vehicles in the U.S. market was an important strategic goal of VW's

senior management.  This project became known within VW as the "US'07"

project.

23.     LIANG and his co-conspirators, however, realized that they could not

design a diesel engine that would both meet the stricter NOx emissions standards

and attract sufficient customer demand in the U.S. market.  Instead of designing a

diesel vehicle that could legitimately meet the heightened U.S. NOx emissions

standards, LIANG and his co-conspirators, including Company A employees,

designed, created, and implemented a software function (the "defeat device") to

cheat the standard U.S. emissions tests.  LIANG and his co-conspirators referred to

the defeat device software as, among other things, the "acoustic function," "switch

logic," "cycle beating" software, or "emissions-tight mode."

24.     While designing and implementing the defeat device software,

LIANG and his co-conspirators knew that U.S. regulators would measure VW's

diesel vehicles' emissions through standard tests with specific, published drive

cycles.  LIANG and his co-conspirators designed the defeat device to recognize

whether a vehicle was undergoing standard U.S. emissions testing on a

dynamometer or being driven on the road under normal driving conditions.  The

defeat device accomplished this by recognizing the standard drive cycles of the EPA's and CARB's tests. If the vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the vehicle's emissions control systems were reduced substantially, causing the vehicle to emit substantially higher NOx, sometimes forty times higher than U.S. standards.

25.     Starting with the first model year 2009 of VW's new "clean diesel" engine through model year 2016, LIANG and his co-conspirators, and others, then installed, and caused to be installed, the defeat device software in VW vehicles marketed and sold in the United States.

26.     For each new model year of VW's diesel vehicles, VW employees met with the EPA and CARB to seek the certifications required to sell the vehicles to U.S. customers. During these meetings, some of which LIANG attended personally, LIANG and his co-conspirators misrepresented, and caused to be misrepresented, to the EPA and CARB staff that VW diesel vehicles complied with U.S. NOx emissions standards, when they knew the vehicles did not. During these meetings, LIANG and his co-conspirators described, and caused to be described,

VW's diesel technology and emissions control systems to the EPA and CARB staff in detail but omitted the existence of a defeat device.

27.    Also as part of the certification process for each new model year, LIANG and his co-conspirators falsely and fraudulently certified, and caused to be certified, to the EPA and CARB that VW diesel vehicles met U.S. emissions standards and complied with the Clean Air Act.  LIANG and his co-conspirators knew that if they had told the truth and disclosed the existence of the defeat device, VW could not have sold any of its diesel vehicles in the United States.

28.    Having obtained the necessary EPA and CARB certificates, LIANG and his co-conspirators marketed, and caused to be marketed, VW diesel vehicles to the U.S. public as "clean diesel" and environmentally-friendly, and promoted the increased fuel economy that comes with diesel-fueled vehicles.  Yet, at the same time, LIANG and his co-conspirators knew that these representations made to U.S. customers were false, that VW's diesel vehicles were not clean, and that VW's diesel vehicles were polluting the environment with NOx emissions well above U.S. emission limits.

29.    As VW's "clean diesel" vehicles in the United States began to age, they experienced higher rates of warranty claims for parts and components related to emissions control systems.  LIANG and his co-conspirators falsely and

fraudulently told, and caused others to tell, U.S. customers and others that a software update in or around 2014 was intended to improve the vehicles when, in fact, LIANG and his co-conspirators knew that the update used the steering wheel angle of the vehicle as a basis to more easily detect when the vehicle was undergoing emissions tests, thereby improving the defeat device's precision in order to reduce the stress on the emissions control systems.

30.     After years of VW selling diesel vehicles in the United States that contained a defeat device, in or about March 2014, West Virginia University's Center for Alternative Fuels, Engines and Emissions published the results of a study commissioned by the International Council on Clean Transportation (the "ICCT study"). The ICCT study identified substantial discrepancies in the NOx emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA and CARB standard drive cycle tests on a dynamometer. Rather than admit the existence of the defeat device and tell the truth to U.S. regulators, VW customers, and the U.S. public, LIANG and his co-conspirators pursued a strategy to disclose as little as possible – to continue to hide the existence of the defeat device software.

31.     Following the ICCT study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions

in VW diesel vehicles when being driven on the road as opposed to on the
dynamometer undergoing standard emissions test cycles.  To do this, CARB, in
coordination with the EPA, repeatedly asked VW questions that became
increasingly more specific and detailed, as well as conducted additional testing
themselves.  LIANG and his co-conspirators knew that if CARB learned of the
defeat device software, CARB would share that information with the EPA, and
vice versa.

32.    In implementing their strategy of disclosing as little as possible,
LIANG and his co-conspirators intentionally made, and caused to be made, false
and fraudulent statements to the EPA and CARB when providing testing results,
data, presentations, and statements to the EPA and CARB.  Through these false
and fraudulent statements, LIANG and his co-conspirators attempted to make it
appear that there were innocent mechanical and technological problems to blame,
while secretly knowing that the primary reason for the discrepancy was the defeat
device installed in every VW diesel vehicle sold in the United States.

33.    LIANG and his co-conspirators also falsely and fraudulently told, and
caused others to tell, U.S. customers and U.S. regulators that a voluntary recall in
or around early 2015 was intended to "fix" the issues that were causing the
discrepancy, when, in fact, LIANG and his co-conspirators knew that the update

14

did not remove the defeat device software that was the true reason for the discrepancy.

34.     LIANG and his co-conspirators caused the defeat device software to be installed on all of the approximately 500,000 VW diesel 2.0 liter light-duty passenger vehicles sold in the United States from 2009 through 2015.

## COUNT 1
### (18 U.S.C. § 371 – Conspiracy to Defraud the United States, to Commit Wire Fraud, and to Violate the Clean Air Act)

35.     Paragraphs 1 through 19 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

36.     From at least in or about November 2006 and continuing through in or about September 2015, in Oakland County, within the Eastern District of Michigan, and elsewhere, defendant JAMES ROBERT LIANG along with others, known and unknown to the Grand Jury, did willfully, knowingly, and deliberately combine, conspire, and confederate and did agree to:

     a. defraud the United States by impairing, impeding, obstructing, and defeating a lawful function of the federal government, that is, the U.S. EPA's function of implementing and enforcing emissions standards for air pollutants for new motor vehicles under the Clean Air Act, by deceitful or dishonest means, in violation of 18 U.S.C. § 371;

b.  commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted by means of wire, radio, and television communication, writings, signs, signals, pictures, and sounds in interstate and foreign commerce for the purpose of executing such scheme and artifice, to wit, falsely representing to U.S. purchasers of VW diesel vehicles that those vehicles were "clean diesel" and met U.S. NOx emissions standards, in violation of 18 U.S.C. § 1343; and

c.  violate the Clean Air Act, by making and causing to be made, false material statements, representations, and certifications in, and omitting and causing to be omitted material information from, notices, applications, records, reports, plans, and other documents required pursuant to the Clean Air Act to be filed or maintained, in violation of 42 U.S.C. § 7413(c)(2)(A).

### **Purpose of the Conspiracy**

37.   Paragraph 20 of this Indictment is realleged and incorporated by reference herein as the purpose of the conspiracy.

## Manner and Means of the Conspiracy

38.   In furtherance of this conspiracy, and to accomplish its object, the methods, manner, and means that were used are described in paragraphs 21 through 34 of this Indictment and are realleged and incorporated by reference as though fully set forth herein.

## Overt Acts

39.   As part of the certification process for the new EA 189 diesel engine, LIANG attended a meeting with CARB in El Monte, California, on or about October 3, 2006, and with the EPA in Ann Arbor, Michigan, on or about October 5, 2006.  During the meetings with the EPA and CARB, LIANG and other VW employees presented on the EA 189 diesel engine, showing how VW had designed an engine that would meet the stricter U.S. emissions standards.  LIANG and the other VW employees made no mention that the EA 189 diesel engine could not meet U.S. NOx emission standards nor disclosed the existence of the defeat device software in their presentations.

40.   On or about November 10, 2006, a Company A employee submitted a request, on behalf of Volkswagen, for a software design change to what was known as the "acoustic function" that would become the defeat device.

17

41.   On or about March 19, 2007, LIANG, and other VW employees, met with representatives of the EPA in Ann Arbor, Michigan.  During the meeting, LIANG and other VW employees described, among other things, the AECDs associated with VW's EA 189 diesel engine.  VW, through LIANG and others, presented an overview of the engine design and proposed operation of the emission control systems.  Throughout the meeting, LIANG and other VW employees knew they planned to include a defeat device in the EA 189 diesel engine but concealed the existence of the defeat device from the EPA.

42.   On or about March 21, 2007, LIANG and other VW employees met with CARB officials in El Monte, California.  CARB had requested that VW specifically discuss the AECDs associated with the emissions control systems in the EA 189 diesel engine design.  Throughout the meeting, LIANG and other VW employees knew they planned to include a defeat device in the EA 189 diesel engine but concealed the existence of the defeat device from CARB.

43.   On or about October 12, 2007, a VW employee emailed a project update to LIANG and others that was an update on the progress of the defeat device software, stating (in German) that even with recognition of driving cycles, the VW diesel engine continued to fail U.S. emissions standards.  The project listed "[s]oftware function adaptations" that included "detection of other driving

18

cycles" as part of a plan for the "[r]eduction of the engine-out emission in the 'emission tight operation.'"

44.  In or about May 2008, LIANG moved from Germany to the United States to work for VW GOA in California to support the launch of VW's "clean diesel" vehicles that included the defeat device software.

45.  On or about July 1, 2008, a VW employee sent an email to LIANG and other VW employees indicating that the new "clean diesel" had arrived in the United States, including pictures of a VW vehicle painted with green vines and the words "Jetta TDI Clean Diesel."

46.  On or about July 29, 2008, LIANG emailed another VW engineer with ideas on how to effectively calibrate the defeat device to recognize U.S. test cycles.

47.  On or about September 5, 2013, LIANG exchanged emails with another VW employee discussing preconditioning for testing sequences with the email subject (in German) "Test sequence GEN1 angle issues."  In response to LIANG's email indicating how the vehicle should be prepared for a test, the VW employee indicated (in German) that the "test sequence sound[ed] exciting," and that "If this goes through without problems, the function is probably truly watertight! ;.)".

48.   On or about April 9, 2014, LIANG received an emailed invitation to attend a meeting with other VW employees to discuss the results of the ICCT study released in March 2014.  A topic noted for discussion was the difference in NOx emissions between when VW diesel vehicles were tested on the dynamometer versus on-road by the study, as well as the potential reasons for the difference while omitting the true reason for the difference, i.e., the defeat device.

49.   On or about December 4, 2014, a VW employee sent an email to LIANG and other VW employees attaching a presentation dated December 2, 2014, showing the results of VW's tests in which VW employees, including LIANG, attempted to simulate the ICCT study's testing.  The presentation showed that VW's testing confirmed the results of the ICCT study and offered explanations for the increased NOx emissions from on-road tests and the standard EPA emissions' tests performed on the dynamometer.  The listed potential reasons for the discrepancy did not include VW's utilization of the defeat device software.  The presentation then explained how "optimized" new software would address the purported reasons for the NOx emissions discrepancy.

50.   On or about March 3, 2015, an email chain that included LIANG and other VW employees, with the subject "VW TDI test at [C]ARB," discussed providing a vehicle to CARB for testing, because CARB was testing the

20

effectiveness of VW's software fix.  A VW employee concluded "check the [s]oftware with James [LIANG]."

51.   On or about April 28, 2015, a VW employee sent an email and copied LIANG and other VW employees.  The VW employee wrote (in German) "we 'only just need a plausible explanation' as to why the emissions are still high!!!"

52.   On or about May 12, 2015, a VW employee sent an email, copying LIANG and other VW employees, in response to testing by CARB and exclaimed (in German), "We need a story for the situation!"

53.   On or about June 29, 2015 a VW employee sent an email, with the subject "[C]ARB Status," and stated (in German): "We must be sure to prevent the authority from testing the Gen 1! …. If the Gen 1 goes onto the roller at the CARB, then we'll have nothing more to laugh about!!!!!"

54.   On or about July 2, 2015, a VW employee sent an email to LIANG and other VW employees, with the subject "RE: Status Update USA," seeking input on how to respond to U.S. regulators, and noting (in German), "the key word 'creativity' would be helpful here."

55.   On or about July 23, 2015, a VW employee sent a calendar invite to LIANG and other VW employees, with the subject "Status Update" and with an

agenda that stated, "[C]ARB is still waiting for Answers .... We still have no good explanations!!!!!"

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### (42 U.S.C. § 7413(c)(2)(A) – Violation of the Clean Air Act)

56.   Paragraphs 1 through 34 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

57.   On multiple dates during the period from on or about July 2011 until on or about September 3, 2015, within the Eastern District of Michigan, and elsewhere, defendant JAMES ROBERT LIANG did knowingly make and cause to be made, false material statements, representations, and certifications in, and omit and cause to be omitted material information from, notices, applications, records, reports, plans, and other documents required pursuant to the Clean Air Act to be filed or maintained, that is, in VW applications for certificates of conformity for certain diesel vehicles, LIANG knowingly omitted, and caused to be omitted, the material fact of the installation of the defeat device on such vehicles from the applications and knowingly and falsely certified, and caused to be certified, that any element of design, system, or emission control installed on or incorporated in such vehicles would not cause the release of pollutants into the ambient air except as specifically permitted by the standards under the Clean Air Act, when, in fact,

LIANG well knew that defeat devices were installed on the vehicles and that the vehicles would release pollutants into the ambient air in violation of the standards set under the Clean Air Act when not in the testing mode because of the defeat devices.

All in violation of 42 U.S.C. § 7413(c)(2)(A) and 18 U.S.C. § 2.

THIS IS A TRUE BILL.

*s/Grand Jury Foreperson*
Grand Jury Foreperson

BARBARA L. MCQUADE
United States Attorney
Eastern District of Michigan

*s/Mark Chutkow*
MARK CHUTKOW
Chief, Criminal Division
JOHN K. NEAL
Chief, Economic Crimes Unit
Assistant United States Attorney
Eastern District of Michigan

23

LESLIE CALDWELL
Assistant Attorney General
Criminal Division
United States Department of Justice


*s/Alison L. Anderson*
BENJAMIN D. SINGER
Chief, Securities & Financial Fraud Unit
ALISON L. ANDERSON
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice


JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division


*s/Jennifer L. Blackwell*
JENNIFER L. BLACKWELL
Trial Attorney
Environment & Natural Resources Division, Environmental Crimes Section
United States Department of Justice

**ORIGINAL**

| United States District Court<br>Eastern District of Michigan | Criminal Case C~~o~~ | Case:2:16-cr-20394<br>Judge: Cox, Sean F.<br>MJ: Patti, Anthony P.<br>Filed: 06-01-2016 At 01:28 PM<br>SEALED MATTER (LG) |
|---|---|---|

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)**[1]: | Judge Assigned: |
| ☐ Yes    ☒ No | AUSA's Initials: *MC* |

**Case Title:** USA v.   JAMES ROBERT LIANG

**County where offense occurred :**  Oakland

**Check One:**    ☐ **Felony**          ☐ **Misdemeanor**          ☐ **Petty**

✓ Indictment/_____ Information --- **no prior complaint.**
_____ Indictment/_____ Information --- based upon prior complaint [Case number:                    ]
_____ Indictment/_____ Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____    **Judge:** _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| | | |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

June 1, 2016
Date

*Mark Chutkow*

Mark Chutkow
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone:313-226-9168
Fax:    313-226-3561
E-Mail address: mark.chutkow@usdoj.gov
Attorney Bar #:

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.