1
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
2
                          SOUTHERN DIVISION

3

    UNITED STATES OF AMERICA,
4
                          Plaintiff,
5
         -v-                          Case No. 16-20394
6
    JAMES ROBERT LIANG,
7
                          Defendant./
8   _____
                              **SENTENCING HEARING**
9                         **BEFORE HON. SEAN F. COX**
                         United States District Judge
10                          867 U.S. Courthouse
                        231 W. Lafayette Boulevard
11                        Detroit, Michigan 48226

12                      **(Friday, August 25, 2017)**

13  APPEARANCES:          MARK CHUTKOW, ESQUIRE
                          Appearing on behalf of the Government.
14
                          DANIEL V. NIXON, ESQUIRE
15                        Appearing on behalf of the Defendant.
    U.S. PROBATION
16  OFFICER:             RICHARD J. ROGALA

17  INTERPRETER:         RANI KEZI

18  COURT REPORTER:      MARIE METCALF, CVR, CM
                          Federal Official Court Reporter
19                        867 U.S. Courthouse
                        231 W. Lafayette Boulevard
20                        Detroit, Michigan 48226
                          *metcalf_court@msn.com*
21

22

23

24

25

1                          **TABLE OF CONTENTS**

2

3      **PROCEEDINGS — FRIDAY, AUGUST 25, 2017**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*U.S.A. v. James Robert Liang*

1        Detroit, Michigan

2        Friday, August 25, 2017

3        At 9:48 a.m.

4                        *     *     *

5        DEPUTY COURT CLERK:  Please rise.  The United States

6   District Court for the Eastern District of Michigan is now in

7   session, the Honorable Sean F. Cox presiding.  You may be

8   seated.

9        The Court calls the matter of the United States of

10  America versus James Robert Liang, case number 16-CR-20394-1.

11       THE COURT:  Good morning.  Could I have your

12  appearances, please?

13       MR. CHUTKOW:  Good morning, Your Honor.  Mark

14  Chutkow for the United States, and I'll let my co-counsel

15  announce themselves, as well.

16       MS. ANDERSON:  Good morning, Your Honor.  Alison

17  Anderson with the United States.

18       MS. BLACKWELL:  May it please the Court, Jennifer

19  Blackwell, for the United States.

20       THE COURT:  Good morning.

21       MR. NIXON:  Good morning, Your Honor.  Daniel Nixon,

22  counsel for Mr. James Liang who's present before the Court,

23  and assisted by a German language interpreter.

24       THE COURT:  Good morning, Mr. Nixon.  Just give me a

25  minute to get organized here.

3

*U.S.A. v. James Robert Liang*

1          Is it Mr. Kezi?  Sir, could you please stand up and

2     give us your full name, please?

3          INTERPRETER:  Rani Kezi.

4          THE COURT:  And it's my understanding that you are a

5     translator from German to English, and English to German, is

6     that correct?

7          INTERPRETER:  Yes.

8          THE COURT:  And Mr. Chutkow and Mr. Nixon, it's my

9     understanding that you've had the opportunity to speak with

10    the translator prior to the start of this proceeding, is that

11    correct?

12         MR. CHUTKOW:  Yes, Your Honor.  And we also observed

13    as the translator spoke to Mr. Liang both in German and

14    English.

15         MR. NIXON:  Yes, Your Honor.

16         THE COURT:  And are both of you satisfied that he

17    can accurately translate English to German and German to

18    English?

19         MR. CHUTKOW:  Yes, your Honor.

20         THE COURT:  And, sir, tell us a little bit about

21    your background, your familiarity with the German language.

22         INTERPRETER:  I came three years ago to the United

23    States and I used to live in Germany for 14 years ago.  And

24    now I am here to study for computer engineering, computer

25    science, and I live in Michigan, in Walled Lake.

4

*U.S.A. v. James Robert Liang*

1          THE COURT:  And are you fluent in both English and

2     German?

3          INTERPRETER:  Yeah.

4          THE COURT:  Okay.  And again, is the government and

5     defense satisfied with his qualifications?

6          MR. NIXON:  Yes, Your Honor.

7          MR. CHUTKOW:  Yes, Your Honor.

8          THE COURT:  And Mr. Nixon, correct me if I'm wrong,

9     it's my understanding that Mr. Kezi will just be there to

10    assist Mr. Liang should there be any issue regarding his

11    understanding of any English that is spoken here today.  Is

12    that correct?

13         MR. NIXON:  That's correct, Your Honor.  That's the

14    practice we employed at the change of plea, and I think

15    that's appropriate today as well.

16         THE COURT:  Okay, thank you very much.  Sir, you may

17    sit down.

18         For the record, I have carefully reviewed the Rule

19    11 Plea Agreement, the presentence report, the government's

20    sentencing memorandum, and motion for downward departure, the

21    defendant's sentencing memorandum, and motion for downward

22    variance, as well as the defendant's supplemental memo, as

23    well as motion for downward variance, as well as the attached

24    exhibits.

25         Now, the plea has been accepted.  Is there a motion

*U.S.A. v. James Robert Liang*

1   for the Court to accept the Rule 11?

2          MR. CHUTKOW:  Yes, Your Honor.  The government moves

3   for the Court to accept the Rule 11 Plea Agreement.

4          MR. NIXON:  Yes, Your Honor, the same.

5          THE COURT:  Okay, the motion is accepted.

6          We need to swear you in, okay?  Please stand and

7   raise your right hand.

8                **RANI KEZI, INTERPRETER, SWORN**

9          THE COURT:  The government previously filed a motion

10  to authorize alternative victim notification procedures,

11  explaining that it would be impractical to identify and

12  provide individual notice of every public proceeding to each

13  potential victim directly or proximately harmed by the

14  charged scheme to defraud in criminal cases.

15         The government has asked this Court to allow it to

16  provide notice to the victims through three different

17  websites maintained and regularly updated by the government.

18  This Court granted that motion on February seventh of this

19  year, 2017.

20         This Court later directed the government to include

21  information on those websites, advising victims that they may

22  submit written victim impact statements to the Court through

23  the assigned probation officer.  This Court confirmed that

24  the government promptly updated its websites to contain the

25  required information.

*U.S.A. v. James Robert Liang*

1          This Court now asks if there are any alleged victims

2     present in the courtroom today that would like to be heard

3     before the Court considers the issue of restitution to crime

4     victims?  Any alleged victims in the Court that wish to

5     speak?  All right, I hear none.

6          The government's website, websites, include victim

7     impact forms that could be used to express written views to

8     the Court and advised that any victim impact statements

9     pertaining to Mr. Liang were to be submitted to Mr. Rogala by

10    April 11, 2017.  Mr. Rogala has advised that he has received

11    no victim impact statements.

12         Is that true, sir, Mr. Rogala?

13         PROBATION OFFICER ROGALA:  That is true, other than

14    in connection with the original sentencing in --

15         THE COURT:  Which I have reviewed.

16         PROBATION OFFICER ROGALA:  Yes.

17         THE COURT:  Thank you.

18         Nevertheless, the Court notes that two miscellaneous

19    cases were filed in this Court by alleged victims of the

20    criminal offenses charged in this criminal case.  In other

21    words, individuals who have claimed to have purchased

22    affected Volkswagen vehicles.

23         Those are miscellaneous case numbers 17-50280,

24    which was filed by Mr. Yarin, Y-a-r-i-n, and miscellaneous

25    case number 17-50336, was initiated by counsel representing a

*U.S.A. v. James Robert Liang*

1    number of victims.  This Court is familiar with and has

2    considered the views of the victims in those actions.

3          The government has expressed the view that as to Mr.

4    Liang, an order of restitution is neither appropriate nor

5    necessary.  The government notes that Defendant VW has agreed

6    to compensate purchasers of affected vehicles in the

7    class-action *In re Volkswagen "Clean Diesel" Marketing, Sales*

8    *Practices and Liability Litigation,* which is in the Northern

9    District of California.

10          After careful deliberation, having considered all

11    competing arguments and views, this Court finds pursuant to

12    18 U.S.C. Section, 3663(a) that from the facts on the record

13    that determining complex issues of fact relating to the cause

14    or amount of victims' losses would be complicated or prolong

15    the sentencing process as to Mr. Liang to a degree that the

16    need to provide restitution to any victim is outweighed by

17    the burden on the sentencing process.

18          Accordingly, this Court declines to order

19    restitution in this case.

20          Mr. Nixon, have you had the opportunity to review

21    the presentence report with your client?

22          MR. NIXON:  I have, Your Honor.

23          THE COURT:  And do you have any objections,

24    additions, corrections, or deletions that you wish to bring

25    to my attention?

*U.S.A. v. James Robert Liang*

1      MR. NIXON:  I would like to bring to the Court's

2   attention that which we have brought to the attention of

3   probation, and which are reflected in the addendum to the

4   presentence report of July 6, 2017.

5      THE COURT:  It's my understanding you have objection

6   to the information contained on page seven, paragraph 17 of

7   the presentence report, and that would be the amount of loss.

8      MR. NIXON:  Yes.  Would the Court prefer that I

9   speak from the lectern or is here okay?

10      THE COURT:  You're fine there, because you have

11   everything, all your paperwork laid out in front of you, so I

12   think it might be easier for you to be there.

13      MR. NIXON:  Yes.  Thank you, very much, Your Honor.

14      Yes, with respect to paragraph 17, it's the defense

15   position that the loss amount attributable -- that has been

16   attributed to Mr. Liang of $8 million overstates the loss.

17      We would simply argue that the defendant had an

18   inferior role in the fraud that bore some relationship, but

19   not full relationship to that $8 million figure, and that the

20   defendant's role in the fraud was for no gain, in comparison

21   to the size of the loss.

22      And so for those reasons, and I think we've cited in

23   our objection number five, which is sort of the same argument

24   because it relates to the same issue, the *Forchette* case, as

25   a way of saying and asking the Court to consider a lower loss

9

*U.S.A. v. James Robert Liang*

1    amount by virtue of the fact that the defendant's role, while

2    a conspirator, and a wrongdoer in this case, the numbers that

3    have been brought about are disproportionately large to his

4    role in the conspiracy, that we would ask the Court to take

5    that into consideration.

6              THE COURT:  Mr. Chutkow?

7              MR. CHUTKOW:  Your Honor, we believe the probation

8    department has correctly assessed that -- the amount of loss

9    in this case.  And I understand Mr. Nixon's arguments, but I

10   think that's more appropriately addressed in terms of perhaps

11   a variance.

12             It was one of the considerations that we had,

13   frankly, in agreeing to a five-year statutory maximum capped

14   offense in this case, which put the guidelines at five

15   years.

16             THE COURT:  I agree, and you are correct.

17             As to the amount of loss, it's been absolutely

18   correctly calculated by probation and it's going to remain as

19   written.

20             Okay.  The second objection that you had at

21   paragraph eight -- sorry, page eight, paragraph 21, as I

22   understand, has been resolved, is that correct?

23             MR. NIXON:  Yes, Your Honor.  It has.

24             THE COURT:  Your next objection is at pages 13 to

25   15, and on page 20, and that involves paragraphs 58, 59, and

*U.S.A. v. James Robert Liang*

1    87, is that correct?

2         MR. NIXON:  Yes, Your Honor.  With respect to that,

3    the defense objects to the conclusion that the defendant has

4    the ability to make a lump-sum payment toward a fine.

5         I think that the method that was used by probation

6    in making that assessment relied upon information that did

7    not take into account the way that Mr. Liang's compensation

8    has flowed while employed as a U.S.-based Volkswagen person.

9         And we've provided information that's reflected in

10   the addendum concerning how income gets distorted because of

11   the fact that individuals are provided housing allowances,

12   and tax allowances, and things like that, that appear to

13   create a much more larger income than what they actually end

14   up having in their pocket.

15        And so it's our position that, while a fine is

16   certainly appropriate in this case, we would think that, and

17   we would ask the Court for a more nominal fine.

18        And I can address that in my remarks later on, but I

19   wanted to state for the record that we think that the way it

20   has been phrased is not appropriate or accurate, given the

21   information that we've supplied.

22        THE COURT:  Well, you're certainly not contending

23   that any of the information, the data given by the probation

24   department regarding your client's income is inaccurate?

25        MR. NIXON:  No.  What I'm saying is, is that the

*U.S.A. v. James Robert Liang*

1    conclusion that he therefore has the ability to pay a large

2    fine based upon that data, I would submit is erroneous.

3             THE COURT:  You know, with all due respect, it's not

4    their conclusion or decision.  It's mine, based upon the

5    information that I have available to me.

6             MR. NIXON:  I understand that, Your Honor, but --

7             THE COURT:  I'm just --

8             MR. NIXON:  It's a recommendation to the Court, and

9    we would take issue with the recommendation.

10            THE COURT:  Mr. Chutkow, any comments?

11            MR. CHUTKOW:  No, Your Honor.  We don't have an

12   objection to the way the probation department has calculated

13   this.

14            And would note that in the presentence report,

15   paragraphs 58 through 59, it identifies all of Mr. Liang's

16   assets and liabilities.

17            THE COURT:  Right.

18            MR. CHUTKOW:  And I've not heard anything

19   specifically that those figures are incorrect.  And when you

20   look at that as a whole I think that it suggests that he does

21   have the ability to pay at least some amount of the fine.

22            THE COURT:  Okay.  That portion of the presentence

23   report will remain as written.

24            And I think the next objection is to page 17,

25   paragraph 70, is that correct?

12

*U.S.A. v. James Robert Liang*

1    MR. NIXON:  Yes, it is.

2    THE COURT:  Any argument or anything further?

3    MR. NIXON:  I would submit it on what we put in the

4   addendum to the --

5    THE COURT:  I'm not going to change it.  It's the

6   cost of incarceration.  It's standard, and it's part of every

7   presentence report.  It just gives me information as to the

8   cost of incarceration --

9    MR. NIXON:  Very well, Your Honor.

10    THE COURT:  -- if I want to include that in the

11   sentence or not.  So that will remain as written, as well.

12    MR. NIXON:  Thank you, Your Honor.

13    THE COURT:  Okay.  And I think the next item is page

14   17 paragraph 73?

15    MR. NIXON:  Your Honor, it's the argument that is

16   essentially the argument that was made with respect to

17   objection number one, and I'll submit it to the Court.

18    THE COURT:  Okay.  Then such being the case, the

19   Court will rule that page 17, paragraph 73 will remain as

20   written.

21    Mr. Nixon, have we covered all of your objections,

22   additions, corrections, or deletions to the presentence

23   report?

24    MR. NIXON:  Yes, you have, Your Honor.

25    THE COURT:  Okay.  Mr. Chutkow, have you had the

*U.S.A. v. James Robert Liang*

1    opportunity to review the presentence report?

2            MR. CHUTKOW:  Yes, Your Honor.  We have reviewed it

3    and we see no inaccuracies in it, either factually or in the

4    calculations.

5            THE COURT:  Okay.  Thank you very much.

6            Mr. Liang, have you had the opportunity to review

7    the presentence report with your attorney?

8            DEFENDANT LIANG:  Yes, I have, Your Honor.

9            THE COURT:  And do you have any other objections,

10   additions, corrections, or deletions that you wish to bring

11   to my attention?

12           DEFENDANT LIANG:  No, I haven't.

13           THE COURT:  All right.  Thank you very much.

14           Mr. Nixon, is there anything you wish to say on

15   behalf of your client before I impose sentence?

16           MR. NIXON:  Yes, Your Honor.

17           You have before you today, a 63-year-old man who is

18   a husband, and a son, and a father.  His family has come from

19   California to be here with him today to support him at this

20   time.  This is a day that he's been waiting for for two

21   years, and probably much longer than that.

22           He was the first person until recently to accept

23   responsibility for what has occurred here.  And he now stands

24   before this Court for sentencing, for judgment.  He's been,

25   as one of the -- really the only -- he's been the worldwide

*U.S.A. v. James Robert Liang*

1    face of this scandal in a way, because he has really been the

2    only person that's been brought, other than Oliver Schmidt,

3    to this courtroom, an individual to face the bar of justice.

4         He has accepted his responsibilities and

5    acknowledged his wrongdoing repeatedly from really the

6    inception of the investigation.  Too late, too late in the

7    sense that his better judgment would have divorced himself

8    from participating in this thing from the inception.

9         We've tried to provide in our papers confluence of

10   events that were taking place in Mr. Liang's life, not as an

11   excuse, but as an explanation.  There are no excuses here, in

12   terms of what's right and what's wrong, and what occurred

13   here was wrong.

14        And he's acknowledged it and he admitted today as

15   he's admitted every day leading up to today.  He wasn't a

16   manager, wasn't a supervisor, he wasn't an executive, as has

17   been described in the media.  He was an engineer.  But as the

18   government correctly points out, corporations only act

19   through the people within them.

20        And it is an inescapable fact that Mr. Liang was

21   among a group of a wide-ranging group of people who made this

22   wheel turn.  He isn't the only one.  He's not the mastermind

23   as was portrayed initially by the company or by others, but

24   he did play a role, and not an insignificant role.

25        But he was never motivated by greed, personal

*U.S.A. v. James Robert Liang*

1    aggrandizement, or he didn't personally profit.  Yeah, he got
2    paid, he got paid a salary.  He was an engineer, and he got
3    paid an engineer's salary while at Volkswagen.

4        And the Court made a really interesting comment in
5    its sentencing of Volkswagen, the company, it talked about
6    how the people who were impacted in these things are always
7    the little people.  The little people are the people who
8    either work on the line or the people who are not the ones
9    who get big quarterly bonuses, they don't sit in the
10   executive suite.  They are the ones who feel this.

11       Mr. Liang did not sit in an executive suite.  He sat
12   in a cubicle.  And he, as the factual basis makes clear, he
13   calibrated this defeat device with others.  He worked with
14   it.  They made it better, in a strange sense, more efficient,
15   better able to pull off the deception.  And there's no
16   running from that.

17       But as part of his atonement for what's taken place,
18   he embarked on a path of cooperation with the government from
19   the moment the agents appeared at his doorstep in October of
20   2015.  He did so because of his recognition that it was the
21   right thing to do, and from that moment on, he was going to
22   embark on a path of trying to do the right thing.  It doesn't
23   excuse what took place earlier, but it is a way to try and
24   make amends for what occurred.

25       We are thankful to the U.S. for its recommendation

*U.S.A. v. James Robert Liang*

1    of a downward departure today.  They have fairly, graciously

2    indicated in their assessment that Mr. Liang's cooperation is

3    worth 40 percent off of the statutory maximum 60-month

4    sentence.

5              We've tried to outline in our papers why we think

6    it's worth a little more, and I'm not going to repeat what's

7    in our papers, because the Court, I'm sure, has read them.

8              THE COURT:  Basically, you're asking for home

9    confinement.

10             MR. NIXON:  We are asking for home confinement.  But

11   what Mr. Liang has tried to do, as a means of getting to the

12   place where his sentence is not greater than necessary, is to

13   work day and night, not only with the government prosecutors

14   in helping them put their case together, but trying to

15   remediate the harm that was caused by the scandal by working

16   with the engineers.

17             After working a full day at his job, he would then

18   go home and work all night with the engineers in Germany who

19   are nine hours ahead of us, to work on the fix, trying to get

20   this thing straightened out.

21             It's not just because it was in his penal interest

22   to do so.  It was the right thing to do.  It was what he

23   believed was the correct posture to take in this case.

24             You know, white-collar defendants in the

25   post-financial crisis where nobody went to jail, and

*U.S.A. v. James Robert Liang*

1    everybody was outraged, and so the pendulum has swung, and

2    now white-collar defendants need to go to jail, individuals,

3    they have to go to jail.

4           And we would submit to the Court -- and the reason

5    that we've tried to articulate a sentence that we think

6    fairly accomplishes the interest of justice, but also gives

7    Mr. Liang an opportunity to move on from this scandal, is

8    that as a non-principal wrongdoer, as not the mastermind, and

9    as somebody who has fully cooperated, it would seem to me

10   that an alternative sentence to a prison sentence would meet

11   the interests of justice.

12          The sentencing guidelines, they're either 30 months

13   or 36 months, and if the Court gives him credit for his plea,

14   and early plea, it could be as low as 21 months.  But as the

15   Court knows, the sentencing guidelines are just one component

16   of the 3553(a) factors in terms of imposing an appropriate

17   sentence.

18          Again, I don't want to repeat what's in my papers

19   about what we argued for regarding the sentencing guidelines,

20   but I do want to point out that the sentencing guidelines, as

21   the Court well knows, are advisory, and they are but one

22   component.

23          And when you look at our recommendation, we've asked

24   the Court to impose a probationary sentence here.  We've

25   identified a specific place where Mr. Liang could, as a

*U.S.A. v. James Robert Liang*

1    condition of his probation, provide community service to an

2    underserved community that directly deals with his expertise

3    and his education, a way of working towards remediating the

4    harm that was caused, to train better engineers and mechanics

5    to work on these things, and to do it appropriately.

6         I mean, I didn't come in here to say let him work in

7    a food bank or let him clean up a park.  That was targeted

8    specifically, because it really will benefit an underserved

9    community.  It will benefit him.

10         We ask for home detention because it seems to me

11   that home detention will enable the Court to extract a

12   measure of punishment that is consistent with certainly what

13   he would receive if he were a citizen, where he would be in a

14   camp, at a camp-like setting, but which he's not eligible for

15   because of the fact that he is not a citizen.  And we think

16   that these factors, when taken -- when you look at all the

17   3553 factors, the sentence that we're asking for is

18   appropriate.

19         This is not a greedy or immoral man.  He committed a

20   crime.  But he's not a criminal in the sense that he's not

21   someone who has spent a lifetime preying on others, or

22   stealing from others, or these other fraudsters that come

23   into these courtrooms that bilk Medicare, or bilk defense

24   contractors, or all this other stuff.

25         I'm not saying he didn't commit a crime.  But he's a

*U.S.A. v. James Robert Liang*

1    good and decent person.  He was blindly, blindly -- blindly

2    executed a misguided loyalty to his employer, sort of asked

3    the tough questions, but didn't push it.

4         We've tried to provide the Court in our papers with

5    some explanations as to how that could come about.  How does

6    a 63-year-old, law-abiding engineer, who's raised this

7    marvelous family, get enmeshed in something like this?

8         I hope we've been able to answer that question for

9    the Court.  His blind allegiance to the only employer he's

10   ever known is the greatest mistake of his life.  And he will

11   now pay a price for it.

12        But home confinement, community service, adequately

13   reflects the seriousness of the offense, but it also takes

14   into consideration his efforts to cooperate, and right the

15   wrong.

16        We ask the Court to let him serve the community, to

17   continue his atonement, and then let him return to Germany to

18   face whatever certain or uncertain sanctions await him there.

19        I think the evidence supports our recommendation.  I

20   think justice demands it, and I think it's the right thing to

21   do.

22        THE COURT:  Okay.  Thank you, very much.

23        Mr. Chutkow?

24        MR. CHUTKOW:  Thank you, Your Honor.  Determining a

25   sentence in this case is a challenging matter.  It was

*U.S.A. v. James Robert Liang*

1    challenging for us in our recommendation and I'm sure it's

2    challenging for the Court in your decision.

3         And that's because this is not a run-of-the-mill

4    case.  The circumstances are very unusual in the country and

5    certainly in this district.  And this was a widespread fraud

6    committed by scores of employees at a multinational

7    corporation.

8         And there are just -- simply aren't a lot of

9    comparables from which we can draw on from our own experience

10   in this courthouse.

11        So to assist the Court, I thought I would focus on

12   three different things.  One, is to look briefly at

13   Mr. Liang's role in this enormous offense, the deterrent

14   value of a sentence of custody in this case, and the value of

15   Mr. Liang's cooperation and the credit it deserves.

16        First, the role in the offense.  I thought Mr. Nixon

17   did a fabulous job in his sentencing memo of contextualizing

18   who Mr. Liang is, and his family life, and his role in his

19   work that he did at Volkswagen.  And he made a number of

20   important points that I think that the Court should consider

21   in making your recommendation.

22        One, it is true that Mr. Liang was not the

23   mastermind of this particular scheme.  He didn't personally

24   profit from the offense, other than his salary, and he didn't

25   supervise others.

*U.S.A. v. James Robert Liang*

1    But this is not a -- and it is true also, that there
2    are higher-level executives that have been charged by the
3    government that have not been brought to justice yet.  They
4    are in Germany and we have not successfully gotten them to
5    this courthouse.
6    But this is not like a drug cartel case that Your
7    Honor has seen in the past, where the drug kingpins
8    intentionally create a scenario where drug couriers come and
9    do the dirty work, while they hide and escape justice in
10   their other countries.
11   Mr. Liang was not a lowly drug courier in this case.
12   He was a brilliant engineer, and he was highly sought after
13   by the company.  And that is why he was a key pivotal figure
14   in this scheme from the very incipient stages, 2006 to the
15   very end of the stage in 2015.
16   He was there in 2006 when the diesel engine that
17   didn't work was created.  He assisted in the calibration of
18   the defeat device when they realized that they could not come
19   up with a way to meet U.S. emission standards.  He was in the
20   United States, one of the select few that was brought here
21   when Volkswagen officials talked to the regulators at the
22   California Air Resources Board and the United States EPA to
23   let them know what this engine was all about, to try to get
24   the approval for this engine to be brought to the United
25   States.

*U.S.A. v. James Robert Liang*

1    He was then brought to the United States in 2008 as

2    the point-person for Volkswagen, the one person that really

3    knew what was going on here in terms of the defeat device,

4    and he was there handling warranty claims because the engine

5    was not working as it was supposed to.

6    And then at the very latter stages of this, in 2015,

7    when the conspiracy was unraveling and falling apart, he was

8    there at one of the last meetings with the regulators when

9    finally there was at least a partial admission that there was

10   a defeat device in the vehicle.

11   Although he was not the mastermind, he was one of

12   the few figures within Volkswagen that was there from the

13   very start of the conspiracy to the very end of the

14   conspiracy.

15   And unlike a drug courier that might work for a drug

16   cartel, who, once they get into the drug organization, it's

17   very difficult to get out, because there is severe

18   repercussions for them to try to walk away.

19   Mr. Liang could have walked away at any time during

20   those nine years.  He could have protested the fact that they

21   were basically coming up with a sham defeat device here.  He

22   could have blown the whistle, or he could have used that

23   expertise and that engineering ability that he had, to go to

24   another company that wasn't doing this kind of stuff.  But he

25   didn't do those things.

*U.S.A. v. James Robert Liang*

1          The next issue I want to talk about was deterrence.

2     And specific deterrence really isn't a factor in this case.

3     I think that Mr. Nixon said it quite well.  His client is

4     not -- does not have a criminal history.  And we don't think

5     it's likely that he is ever going to commit an offense like

6     this again.  But a sentence by the Court of custody will send

7     a powerful message to the rest --

8          THE COURT:  You're asking for 30 months?

9          MR. CHUTKOW:  We are asking for three years, 36

10    months.

11         A sentence like that would sent a powerful deterrent

12    message to the rest of the industry, because corporate

13    employees are not motivated by the fines against the company.

14    They are motivated by the word that they hear about other

15    employees that receive custodial sentences.

16         About a dozen years ago, when this case was

17    first being -- or when the scheme was first being hatched at

18    Volkswagen, I had the opportunity to prosecute a number of

19    cases involving international cargo shipping companies that

20    were dumping used oil into the middle of the ocean under the

21    cover of darkness.

22         And during those cases, I confronted a number of the

23    engineers that worked on those ships, who made the decision,

24    who were in a -- to dispose of the waste oil in the ocean.

25         And they were in a quandary.  They had to make a

*U.S.A. v. James Robert Liang*

1    decision for themselves between what was beneficial to the

2    company in terms of business costs and efficiency, and the

3    environment, and they chose the company.  And we got

4    multi-million dollar criminal fines in those cases.

5          But I can tell you it was the word of the sentences

6    on these engineers that were in these ships that sent shock

7    waves through the industry, and that caused reforms to be

8    made.

9          I don't think the Court can underestimate the

10   ramifications of a custodial sentence in this case in terms

11   of the auto industry.  There is the press in a separate room

12   listening to this.  It's going to be -- the case has been

13   widely reported, and your sentence is going to be widely

14   reported in this case.

15         And if an automobile engineer gets jail time, it

16   will be all over the automobile news, and others in

17   Mr. Liang's situation will think twice before they follow in

18   his footsteps.  And they will know that you can't just say

19   "I'm doing my job."  It's not a proper excuse when your

20   company is engaged in criminal wrongdoing.

21         And finally, I wanted to address cooperation in this

22   case, and specifically Mr. Liang's cooperation in the

23   investigation and prosecution of others.

24         He came in and he cooperated early.  He met with the

25   government eight times.  He provided us information and

*U.S.A. v. James Robert Liang*

1    corroborated information that helped us in our investigatory

2    steps going forward.

3        He was willing to testify against any of the

4    executives that might be brought here, including Mr. Oliver

5    Schmidt.  Mr. Schmidt was made known of Mr. Liang's

6    cooperation and he pled guilty.  I think we should presume

7    that he pled guilty, in part, because people like Mr. Liang

8    were willing to testify against him.

9        And so he deserves credit for that.  We have

10   suggested that that credit be a 40 percent departure from his

11   statutory maximum sentence in this case, which is five years.

12       So in sum, the government believes that a three-year

13   sentence strikes the appropriate balance in this case.  It

14   recognizes the enormity of the fraud and Mr. Liang's role in

15   it.

16       It recognizes the deterrent effect of a sentence

17   like that on the industry and it properly credits Mr. Liang

18   for his cooperation in this case.

19       THE COURT:  Thank you, very much.

20       MR. CHUTKOW:  Thank you.

21       THE COURT:  Mr. Liang, you have the right to speak

22   in court here on your own behalf.  Is there anything you wish

23   to say to me before I impose sentence?

24       DEFENDANT LIANG:  No, Your Honor.

25       THE COURT:  Are you sure?

*U.S.A. v. James Robert Liang*

1        DEFENDANT LIANG:  Yes, I am sure.

2        THE COURT:  Okay, thank you.

3        Mr. Liang, you pled guilty to Count One, conspiracy

4   to defraud the United States, to commit wire fraud, and to

5   violate the Clean Air Act with a Rule 11 on September 9th of

6   last year, 2016.

7        In a moment I'm going to impose a sentence

8   sufficient but not greater than necessary to comply with the

9   purposes set forth in 18 U.S.C. Section 355 -- sorry,

10  3553(a).

11       I have considered the nature and circumstances of

12  the offense.  You started with VW in Germany in 1983 working

13  in the diesel development department in Wolfsburg, Germany.

14       In about 2006, you and your co-conspirators began to

15  design a new EA-189 diesel engine.  Soon, you and your

16  co-conspirators soon realized however that the engine could

17  not meet both consumer expectation as well as new stricter

18  U.S. emission standards.

19       As a result, you and your co-conspirators pursued

20  and planned the use of a software function to cheat standard

21  United States emissions tests.  That's known as a defeat

22  device.

23       You used the defeat device software while working on

24  the EA-189 and it assisted in making a defeat device software

25  work.  The co-conspirators needed to do so to obtain a

*U.S.A. v. James Robert Liang*

1    certificate of conformity from the United States

2    Environmental Protection Agency in order to sell vehicles in

3    the United States.

4        You understood that the EPA would not certify

5    vehicles for sale in the United States if the EPA knew that

6    the vehicles contained a defeat device.

7        In or around 2008, you worked with your

8    co-conspirators to calibrate and refine the defeat device.

9    This defeat device recognized whether the affected VW diesel

10    vehicles were undergoing standard United States emission

11    testing or being driven on the road under normal driving

12    conditions.

13        The defeat device accomplished this by recognizing

14    the standard drive cycles used in the EPA's emissions tests.

15    If the vehicle software detected that it was being tested,

16    the vehicle performed at one mode, which satisfied the United

17    States emissions testing standards for nitrogen oxide.

18        If the defeat device detected that the vehicle was

19    not being tested, it operated in a different mode, in which

20    the vehicle's emission control systems were reduced

21    substantially, causing the vehicle to emit substantially

22    higher amounts of nitrogen oxide, sometimes 40 times higher

23    than the United States standards.

24        You moved to the United States in May 2008 to assist

25    in the launch of the VW diesel vehicles with EA-189 engines.

*U.S.A. v. James Robert Liang*

1    From about May 2008 to the present you were the leader of
2    diesel competence for VW Group of America.  In that role, you
3    assisted in the certification, testing, and warranty issues
4    for VW diesel vehicles in the United States.

5          For each new model year of VW diesel vehicles, VW
6    employees met with the EPA to seek certifications required to
7    sell the vehicles to United States customers.  During one of
8    these meetings, which you attended personally in Ann Arbor,
9    Michigan, with the EPA on March 19, 2007 and on March 21,
10   2007 with the California Air Resources Board, you
11   participated as your co-conspirators misrepresented that VW
12   diesel vehicles complied with United States emission
13   standards.

14         During this meeting, your co-conspirators described
15   VW's diesel technology and emissions control systems in
16   detail to the staffs of the EPA and the CARB, but
17   intentionally omitted your and your conspirators' plan to
18   include a defeat device in VW diesel vehicles.

19         You knew that VW was cheating by implementing the
20   defeat device and you and your co-conspirators were deceiving
21   the EPA in this meeting.

22         As part of the certification process for each new
23   model year, including model years 2009 through 2016, you knew
24   your co-conspirators continued to falsely and fraudulently
25   certify to the EPA and CARB that VW diesel vehicles met

*U.S.A. v. James Robert Liang*

1    United States emission standards and complied with the Clean

2    Air Act.

3             During this time, you and your conspirators knew

4    that VW marketed VW diesel vehicles to the United States

5    public as clean diesel and environmentally friendly, and

6    promoted the increased fuel economy.

7             You and your co-conspirators knew that these

8    representations made to the United States' customers were

9    false, and that VW's diesel vehicles were not clean.  As VW's

10   clean vehicles -- sorry.  As VW's clean diesel vehicles in

11   the United States began to age, they experienced higher rates

12   of warranty claims for parts and components related to the

13   emissions control system.

14            Some of your co-conspirators believed that the

15   increased claims were a result of the vehicle operating in

16   testing mode too long, rather than switching to road mode.

17   Because of these increased claims, you worked with your

18   co-conspirators to enhance the defeat device to allow the

19   vehicle to more easily recognize when the vehicle was no

20   longer in testing mode.

21            You knew that your co-conspirators falsely and

22   fraudulently told United States' customers and others that a

23   software update in or about 2014 was intended to improve the

24   vehicles, when in fact you and your co-conspirators knew that

25   part of the update was intended to improve the defeat

*U.S.A. v. James Robert Liang*

1    device's precision in order to reduce the stress on the

2    emissions control systems.

3         In the spring of 2014, a nongovernmental

4    organization published the results which identified

5    substantial discrepancies in the emissions from certain VW

6    vehicles when tested on the road compared to when these

7    vehicles were tested undergoing EPA standard cycle tests.

8         Following the study, CARB, in coordination with the

9    EPA, attempted to work with VW to determine the cause for

10   higher emissions in VW diesel vehicles on the road, as

11   opposed to in the lab.  You and your co-conspirators

12   discussed how they could answer these agencies' questions

13   without revealing the defeat device.

14        You know that after these discussions your

15   co-conspirators intentionally made fraudulent explanations to

16   the EPA and CARB when providing test results, data,

17   presentations, and statements to the EPA and CARB by failing

18   to disclose the fact that the primary reason for the

19   discrepancy was the defeat device.

20        You knew that your co-conspirators also falsely and

21   fraudulently told United States' customers, EPA, and CARB

22   that a voluntarily recall in or around early 2015 was

23   intended to fix the issues that were causing the discrepancy,

24   when in fact, you and your co-conspirators knew that although

25   the update lowered the emissions in certain VW diesel

*U.S.A. v. James Robert Liang*

1    vehicles on the road, the update did not remove the defeat

2    device software that was the true reason for the discrepancy.

3           You and your co-conspirators caused the defeat

4    device software to be installed in -- to be installed in all

5    of the approximately 500,000 VW diesel two liter, light duty

6    passenger vehicles sold in the United States from 2009

7    through 2015.

8           In my mind, this is a serious crime and this

9    involves massive fraud upon the American consumer, which you

10   knew and played a very important role in.

11          I've considered your history and your

12   characteristics.  Unlike most of the people I see before me

13   in criminal cases, you do not have a criminal history, or no

14   criminal record.

15          You are 63.  You're a citizen of Germany.  You came

16   from a very stable family background, good parents, good

17   family.  You and your wife should be proud of yourselves.

18   You worked hard to have a family.  You worked hard to take

19   care of your family.  You've been married since -- for about

20   26 years, to Dagmar.  She's a citizen of the United States.

21   You have three children who are good residents of the United

22   States and good citizens of Germany.

23          I dispute or have an issue with respect to Mr. Nixon

24   as to your standard of living.  You seem to enjoy a rather

25   good standard of living.  You live in an exclusive area of

*U.S.A. v. James Robert Liang*

1    Southern California.  You live in a 3600 square-foot home in

2    Newberry Park with your wife and children, and your

3    son-in-law.

4          And it is a five-bedroom house, with a swimming

5    pool, again, in a very exclusive area of California, five

6    bedrooms, and of course, VW pays the rent.

7          You don't have any health -- you have no physical or

8    mental health issues.  You have no substance abuse issues.

9    Again, you seem to be a very good father, a very good family

10   man.  You are a very well educated, and arguably brilliant

11   engineer.

12         And you obviously are very loyal to VW, and have

13   been since 1982 or 1983 when you started working for them.

14   Arguably, too loyal.

15         Your financial returns from 2012 through 2014

16   indicate that you are making $350,000 a year.  Again, you are

17   a loyal individual, a brilliant engineer, but it seems to me

18   that certainly you didn't want to walk away from this

19   lifestyle that you had in Southern California, and the

20   income.  Again, the beautiful home and area where you lived,

21   which would have been the right thing to do, to walk away

22   from what VW and what VW was doing to the American consumer.

23         So we know you're a good family man, a very, very

24   successful individual making a good living, living in a very

25   nice area of Southern California.

*U.S.A. v. James Robert Liang*

1        So I have considered your history and your

2   characteristics.  I have considered the need for the sentence

3   imposed to reflect the seriousness of the offense, promote

4   respect for the law, and to provide just punishment for what

5   you did, and this fraud, that you were an important and key

6   player, and it's a very serious offense.

7        I've considered the need to afford adequate

8   deterrence to criminal conduct, to protect the public from

9   further crimes by you.  And I think we all agree here that

10  you will not commit further crimes.  I don't see that

11  happening.

12        I've considered the need for the sentence imposed to

13  provide you with needed educational, or vocational training,

14  medical care, or other correctional treatment in the most

15  effective manner.

16        I've considered the kinds of sentences available.

17  Again, you pled guilty to this conspiracy charge, which was a

18  charge that the government filed against you after a great

19  deal of cooperation.

20        This has a maximum of five years in prison.  The

21  guidelines, which I noted earlier, the maximum guidelines are

22  60 months, five years.  But that's because that's the most

23  that could be given to you, the maximum.

24        But in reality, the actual guidelines for the

25  sentence are -- the actual guidelines for this case are 210

*U.S.A. v. James Robert Liang*

1  to 262 months in prison.  But because the maximum is five

2  years, the guidelines become 60 months, which again, is the

3  most that I can give you.

4          I also note the guidelines for the fine in this case

5  are $20 to $200,000.  Is that correct, Mr. Rogala?

6          PROBATION OFFICER ROGALA:  It is, Your Honor.

7          THE COURT:  Okay.  The maximum fine is $250,000, the

8  supervised release term is anywhere from one to three years,

9  and of course probation is an option in this case.

10         So I can go up to five years, I can give you

11  probation, I can give you what your attorney requests, which

12  is a variance, I can give what the government requests, which

13  is also a variance/departure, or I can give you anywhere in

14  between in terms of the sentence in this case.  So I have

15  considered the kinds of sentences and the sentencing range.

16         I'm also aware that some day in the not-too-distant

17  future, Mr. Schmidt is going to be coming before me for

18  sentencing, and I do note the max I can give Mr. Schmidt in

19  his case if I accept the Rule 11 Agreement is a total of

20  seven years.

21         So I have considered the need to avoid unwarranted

22  sentence disparities amongst defendants with similar records,

23  which have been found guilty of similar conduct in this case.

24         So I have considered all the factors under 18 U.S.C.

25  Section 3553(a) in imposing the sentence that I'm going to

*U.S.A. v. James Robert Liang*

1  impose upon you right now.

2        Mr. Liang, I have given a lot of thought about this

3  case and about the sentence, and the sentence that I'm going

4  to give you.

5        Your cooperation and regret is noted, but it doesn't

6  excuse your conduct.  There's been a discussion that you're

7  not a drug dealer or a courier for a drug dealer, and

8  involved in some type of violent conspiracy or gang, which I

9  understand.

10        Mr. Chutkow has brought up the issue of deterrence

11  of others in the corporate world, and brought up issues of

12  healthcare fraud, and impact that healthcare fraud sentences

13  may or may not have on medical providers, which I'm obviously

14  aware of, handling all those types of cases over the years.

15        Again, you're a family man which I've kind of

16  factored into the sentence, and because of you and your

17  family, it's for me -- it's a difficult sentence to impose to

18  someone who's been successful, obviously a very hard worker,

19  and someone who's been loyal, but again too loyal to VW.

20        So it is a very difficult sentence that I'm going to

21  impose on you personally, because of who you are, and who

22  your family is.  And I'm looking out and I see your family in

23  the first row, and again, this is a difficult sentence to

24  impose.

25        But I have an obligation as a federal judge in the

*U.S.A. v. James Robert Liang*

1    United States to follow the law, even when following the law

2    is difficult to attempt to do justice even when it hurts

3    individuals and families.  It is difficult, but that is my

4    obligation to the citizens of the United States and the

5    Eastern District of Michigan.

6        You were an important member of a long-term

7    conspiracy involving VW engineers and senior management,

8    which perpetrated massive, and as Mr. Chutkow mentioned on

9    page seven of the sentencing memo, stunning fraud.  And it is

10   stunning fraud on the American consumer.

11       This is a very serious and troubling crime against

12   our economic system.  This crime by you, and your

13   co-conspirators and VW, attacks and destroys the very

14   foundation of our economic system, and that's trust, trust by

15   the consumer, or by the buyer.

16       Without the trust in corporate America, the economy

17   can't function.  It can't function.  And what VW did and you

18   and your co-conspirators did is undermining again one of the

19   most fundamental foundations of our economic system.  Again,

20   that's trust between buyer and seller.

21       Hopefully, the sentence that I'm about to impose on

22   you will deter other engineers and managers in the corporate

23   world, who think about committing fraud upon the American

24   consumer.

25       Again, you pled guilty to Count One, conspiracy to

*U.S.A. v. James Robert Liang*

1    defraud the United States, to commit wire fraud, and to

2    violate the Clean Air Act with a Rule 11 on September 9th of

3    last year, 2016.

4            Pursuant to the sentencing Reform Act of 1984, the

5    Court, considering the sentencing guidelines which were

6    stated on the record, and which of course are advisory, and

7    the fact that the statutory maximum is 60 months, and as well

8    as your cooperation, and the factors contained in 18 U.S.C.

9    Section 3553(a), which I have also stated on the record,

10   hereby commits you to the custody of the United States Bureau

11   of Prisons for a term of 40 months.

12           Upon release from imprisonment you shall be placed

13   on supervised release for a term of two years, to be

14   supervised in the Southern District of California if not

15   removed from the United States.  The term of supervised

16   release shall be unsupervised while you remain outside the

17   United States.

18           It is further ordered that you pay a special

19   assessment of $100, which is due immediately.

20           The Court is going to impose a fine of $200,000,

21   which is due immediately.  Interest shall not accrue.

22           While in custody, you shall participate in the

23   inmate financial responsibility program.  The Court is aware

24   of the requirements of this program and approves payment

25   schedules of this program and hereby orders your compliance.

*U.S.A. v. James Robert Liang*

1    Interest shall not accrue.

2              Mandatory drug testing is suspended.

3              I am waiving the cost of incarceration.

4              While in supervision, you shall abide by the

5    standard conditions as adopted by the United States District

6    Court for the Eastern District of Michigan, and shall comply

7    with the following special conditions.

8              Due to the imposition of a fine, you shall not incur

9    any new credit card charges or open additional lines of

10   credit without the approval of your probation officer, unless

11   you are in compliance with the payment schedule.  You shall

12   provide your probation officer with access to any requested

13   financial information.

14             You shall make monthly installment payments on any

15   remaining balance of the fine and special assessment at a

16   rate and schedule recommended by the probation department and

17   approved by this Court.  And that will be the sentence of

18   this Court.

19             Mr. Nixon, do you have the Rule 11 Agreement with

20   you?

21             MR. NIXON:  I do, Your Honor.

22             THE COURT:  And could you please turn to page 13,

23   paragraph nine?

24             MR. NIXON:  Yes, your Honor.

25             THE COURT:  And could you direct that paragraph to

*U.S.A. v. James Robert Liang*

1    Mr. Liang?

2              Mr. Liang, it reads,

3              "Defendant, being you, waives any right he may

4              have to appeal his conviction on any grounds.

5                    This waiver does not bar a claim of

6              ineffective assistance of counsel in court."

7    Sir, did you hear what I just read to you?

8              DEFENDANT LIANG:  Yes.

9              THE COURT:  Mr. Liang, you may be entitled to

10   appellate review of this conviction and sentence.  If you

11   wish to appeal this conviction and sentence, you must do so

12   within 14 days.

13             Did you hear what I've just said?

14             DEFENDANT LIANG:  Yes.

15             THE COURT:  And if you cannot afford to hire an

16   attorney to represent you on appeal, you need to file the

17   necessary indigency paperwork immediately with the Clerk of

18   the Court.

19             Did you hear what I just said?

20             DEFENDANT LIANG:  Yes, Your Honor.

21             THE COURT:  And again, if you wish to appeal this

22   conviction and sentence, and you may -- and again I use the

23   word "may" be entitled.  If you wish to appeal this

24   conviction and sentence, I would suggest you discuss this

25   issue immediately with your attorney.

*U.S.A. v. James Robert Liang*

1          Did you hear what I just said?

2          DEFENDANT LIANG:  Yes.

3          THE COURT:  All right.

4          Any other sentencing issues by the defense?

5          MR. NIXON:  We would ask for Mr. Liang to be given

6  an opportunity to self surrender.

7          THE COURT:  Government's position?

8          MR. CHUTKOW:  No objection, Your Honor.

9          THE COURT:  All right.

10         MR. NIXON:  I would also ask that the Court make a

11  strong recommendation that the sentence be served at the Taft

12  Correctional Institute in California, which is close to his

13  daughters who will be remaining in Southern California.

14         THE COURT:  That I will do, but that's -- I will

15  make that recommendation, but you do understand it's not my

16  decision, that it's up to the Bureau of Prisons.  And so --

17  but I will make that recommendation, and of course that does

18  also, includes the caveat, he needs to qualify for Taft.

19         MR. NIXON:  Understood, Your Honor.  I'm simply

20  asking the Court.

21         THE COURT:  Any other sentencing issues by the

22  defense?

23         MR. NIXON:  Not at this time.

24         THE COURT:  The --

25         MR. NIXON:  No, Your Honor.

*U.S.A. v. James Robert Liang*

1      THE COURT:  Okay.  Any other sentencing issues by

2    the government?

3      MR. CHUTKOW:  No, Your Honor.

4      THE COURT:  Any objection to the sentence by the

5    defense?

6      MR. NIXON:  We have no further objections with

7    respect to what we have articulated here in court, no.  But I

8    would like to raise the issue that we had raised previously

9    with the Court in chambers.

10      THE COURT:  So specifically your objection to the

11    sentence deals with the issue of this Court's decisions on

12    your objections to certain paragraphs in the presentence

13    report.  Is that it?

14      MR. NIXON:  That's right.  I believe that's what the

15    Court is asking, where you're not inviting any further

16    argument with the sentence.

17      THE COURT:  Okay.  I just want to make sure that

18    encompasses all your objections.

19      Any objection to the sentence by the government?

20      MR. CHUTKOW:  No, Your Honor.

21      THE COURT:  All right, you want to bring something

22    else to my attention?

23      MR. NIXON:  Yes, Your Honor.  We would be asking the

24    Court for a judicial order of removal to be executed so that

25    Mr. Liang can leave once the sentence is completed, without

42

*U.S.A. v. James Robert Liang*

1    having to be put into the immigration deportation process.

2              THE COURT:  And the government's position?

3              MR. CHUTKOW:  Your Honor, we have no objection, and

4    are prepared to sign a joint motion to that effect.

5              THE COURT:  If that's the case, unless there's

6    something that I'm unaware of, I don't perceive any problem

7    with me signing that type of order.  Okay?

8              MR. NIXON:  Can we have leave to submit that to the

9    Court in the coming days?

10             THE COURT:  Yeah.  If it's joint, that's fine.

11             MR. NIXON:  Thank you, Your Honor.

12             THE COURT:  Okay.  Any other issues?

13             MR. CHUTKOW:  Nothing further, Your Honor.

14             THE COURT:  Mr. Rogala, anything else?

15             PROBATION OFFICER ROGALA:  No, Your Honor.

16             MR. NIXON:  Nothing further.

17             THE COURT:  All right.  Thank you.

18             DEPUTY COURT CLERK:  All rise.

19             (Court in recess at 11:21 a.m.)

20                        *       *       *

21

22

23

24

25

*U.S.A. v. James Robert Liang*

1

2

3

4

5

6

7

8

9

10

11

12

13

14 **C E R T I F I C A T I O N**

15        I, Marie J. Metcalf, Official Court  Reporter for

16 the United States District Court, Eastern District of

17 Michigan, Southern Division, appointed pursuant to the

18 provisions of Title 28, United States Code, Section 753, do

19 hereby certify that the foregoing is a correct transcript of

20 the proceedings in the above-entitled cause on the date

21 hereinbefore set forth.

22        I do further certify that the foregoing transcript

23 has been prepared by me or under my direction.

24 s\Marie J. Metcalf                          August 26, 2017

25 Marie J. Metcalf, CVR, CM                    (Date)